**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN MICHAEL RICKHER, individually and on behalf of a class of similarly situated persons, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 05 C 2152 |
| THE HOME DEPOT, INC., a Delaware corporation, | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Before the court are several motions: (1) defendant's motion
for summary judgment; (2) plaintiff's motion for summary judgment
on Count II; and (3) plaintiff's motion for class certification.
For the reasons explained below, defendant's motion for summary
judgment is granted; plaintiff's motion for summary judgment on
Count II is denied; and plaintiff's motion for class certification
is denied.

**BACKGROUND**

In this action, plaintiff John Michael Rickher claims that
defendant The Home Depot, Inc. ("Home Depot") violated the Illinois
Consumer Fraud and Deceptive Business Practices Act (the "CFA"),
815 ILCS 505/2 et seq., in connection with Home Depot's sale of
damage waivers to tool and equipment rental customers in Illinois.

Plaintiff alleges that when he rented tools from Home Depot stores, he was presented with a rental agreement that by default included an assessment for a damage waiver equal to ten percent of the rental cost, without being informed that the damage waiver was optional and without being asked whether he wanted to purchase the damage waiver. The two-count Second Amended Complaint alleges that Home Depot's conduct was unfair and/or deceptive in violation of the CFA because the damage waiver is worthless and because customers were deceived into believing it is a mandatory charge when it is in fact optional. Plaintiff seeks to represent a class of persons who rented tools or equipment from Home Depot stores in Illinois, and who paid damage waiver charges, during the three years before the filing of the complaint.[1]

The undisputed material facts are as follows. Over the last several years, plaintiff rented tools from Home Depot stores in Chicago, usually from either the North Avenue store or the Elston Avenue store. For each rental, the salesperson gave plaintiff a Rental Agreement, and plaintiff signed the Rental Agreement. The Rental Agreement consists of three pages: (1) Home Depot's copy of the Rental Agreement (the "Front Page"), which includes the customer's signature; (2) the customer's copy of the Rental

---

[1] The complaint was filed on March 4, 2005, so the three-year period would begin on March 4, 2002.

Agreement; and (3) the Terms and Conditions page (the "Terms Page").

Home Depot offers a damage waiver for tool rentals, which is optional and listed as a separate charge on the Front Page. The Rental Agreement defines the rights and obligations of the parties, and it also describes the terms and conditions of the damage waiver, including the scope of protection from liability for damage to the rented tools. From November 2000 to March 2005, Home Depot used a version of the Rental Agreement that included a box labeled "Special Terms and Conditions" on the Front Page. Inside the box were a number of statements that apparently could vary depending on the type of tool or equipment rented, but which usually included the following statement: "I ACCEPT THE BENEFITS OF THE DAMAGE WAIVER (IF APPLICABLE) DESCRIBED IN PARAGRAPH 11 IN THE TERMS AND CONDITIONS OF THIS RENTAL AGREEMENT." Underneath the box was the statement "I HAVE READ AND AGREE, AS INITIALED TO THE RIGHT, TO THESE SPECIAL TERMS AND CONDITIONS." Next to that statement was another box labeled "Customer Initials." The bottom portion of the Front Page called for the customer's signature underneath text that included the sentence "I agree to the terms and conditions printed on this page and on the other page(s) of this agreement." (Def.'s Reply, Ex. A to Ex. 3.)

From November 2000 to November 2005, the Terms Page of the
Rental Agreement provided as follows with regard to the damage
waiver:

> **Damage Waiver**. If I pay the damage waiver charge for any
> Equipment, this agreement shall be modified to relieve me
> of liability for accidental damage to it, but not for any
> losses or damages due to theft, burglary, misuse or
> abuse, theft by conversion, intentional damage,
> disappearance or any loss due to my failure to care
> properly for such Equipment in a prudent manner
> (including without limitation by using proper fuel, oil
> and lubricants and not exceeding such Equipment's rated
> capacity, if applicable).

(Id.)[2]

Home Depot has issued a Standard Operating Procedure ("SOP")
document to its employees that governs its tool rental policies and
procedures. At the times relevant to the complaint, Home Depot's
SOP (a version created in 1999) provided that an employee should
perform the following pertinent steps in renting a tool: greeting

---

[2] After this suit was filed, Home Depot modified the language of the
Rental Agreement. The term "damage protection" was used instead of "damage
waiver," and in March 2005, the language on the Terms Page that explains the
damage waiver was changed to the following: "Damage Protection is an optional
service offered by Home Depot to cover repair or replacement charges if the
equipment rented from Home Depot is damaged during normal use. The charge for
the Damage Protection service is 10% of the total rental fee and will appear as
a separate line-item on the invoice. Damage Protection is not insurance. Damage
Protection only covers the costs of repair or replacement of the rented equipment
damaged during normal use of the equipment. Damage Protection does not cover
loss of or damage to the equipment during transport or loss or damage to the
equipment caused by theft, abuse, misuse, neglect, intentional acts or failure
to follow the instructions provided for proper use and care of the rented
equipment."

In June 2006, the Front Page was modified to include two options regarding
damage protection; the customer could initial either "I HAVE BEEN OFFERED THE
DAMAGE PROTECTION DESCRIBED IN PARAGRAPH 11 OF THE TERMS AND CONDITIONS OF THIS
RENTAL AGREEMENT AND HEREBY ACCEPT IT" or "I HAVE BEEN OFFERED THE DAMAGE
PROTECTION DESCRIBED IN PARAGRAPH 11 OF THE TERMS AND CONDITIONS OF THIS RENTAL
AGREEMENT AND HEREBY DECLINE IT."

the customer; "qualifying" the customer; recommending tools and/or accessories and related items; creating the contract; and explaining how to use and maintain the tool. (Ex. 4 to Pl.'s Brief in Opp'n to Def.'s Mot. for Summ. J. at 2:1.) The "qualification" step included obtaining the customer's identification and a deposit as well as the following step regarding the damage waiver:

> Inform the customer about the benefits of accepting the Damage Waiver option on the Rental Agreement contract. Quote a price (not a percentage) to the customer for the Damage Waiver.
> **Note:** The cost of the Damage Waiver is equal to 10% of the tool's basic rental charge.

(Id. at 2:4.) After particular tools and accessories were recommended, the SOP provided that the next step was to create the contract. The first two sub-steps in this step were "create and print Rental Agreement" and "review with customer." (Id.) As for the "review" sub-step, the "Rental and Fees" section of the SOP provided in relevant part:

> To process Damage Waivers, follow these steps:
> 1. Review the contract with the customer. Circle the Damage Waiver provision in the Special Terms and Conditions section of the agreement.
> 2. Explain to the customer what the Damage Waiver covers. Discuss the benefits of having the Damage Waiver as part of the contract.
> 3. Ask the customer if they want the Damage Waiver.
> 4. If they do not want the Damage Waiver, remove the fee from the contract. Reprint the contract if necessary.
> **Note:** A Damage Waiver fee can be removed from a contract in one of three ways:
> * Touch **Change** from the Summary screen
> * Touch **Change Contract** from the Main Menu
> * Touch **Remove Damage Waiver** from the Change Options screen

(Ex. 4 to Pl.'s Brief in Opp'n to Def.'s Mot. for Summ. J. at 2:35.)

Plaintiff paid for a damage waiver in connection with the great majority of his tool rentals from June 2000 through March 2005. (On December 28, 2004, January 6, 2005, March 18, 2005, and at least one other occasion, plaintiff declined to purchase the damage waiver.) Plaintiff testified at his deposition that although he could not remember the exact details of each and every tool rental transaction, he did not recall that Home Depot employees ever complied with the Home Depot SOP and asked him whether he wanted to purchase the damage waiver. Rather, the typical occurrence when plaintiff rented a tool was that the employee would simply print the Rental Agreement (which included a charge for the damage waiver), give it to plaintiff for signature, and plaintiff would sign the Agreement. According to plaintiff, he was aware that he was paying for a damage waiver when he signed the Agreements, but he was not aware that the waiver was optional.

Plaintiff testified that he did not discover that the damage waiver was optional until January 2005, when he rented a pipe wrench and asked the salesperson if he could decline the waiver. After some delay, and after initially being told that the waiver was "automatically" on the rental agreement, the waiver charge was

removed from the rental agreement. (Tr. of Pl.'s Dep. at 144-45, 149.)

Plaintiff never damaged any of the tools or equipment that he rented; therefore, plaintiff never invoked the damage waiver for any of his rentals.

## DISCUSSION

Home Depot now moves for summary judgment. Plaintiff has filed a cross-motion for summary judgment on Count II of the Second Amended Complaint as well as a motion for class certification.

### A.   Summary Judgment Motions

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).   In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999).   "Summary judgment should be denied if the dispute is 'genuine':   'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"   Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).   The court will enter summary

judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." <u>McGrath v. Gillis</u>, 44 F.3d 567, 569 (7th Cir. 1995).

Plaintiff characterizes his case as consisting of two theories, the "mandatory" theory and the "worthless" theory. Because Count I of the Second Amended Complaint invokes both theories and Count II invokes the "worthless" theory, we will organize our discussion according to each theory rather than by counts of the complaint.

**1.   The "Mandatory" Theory**

Home Depot moves for summary judgment on Count I, which includes plaintiff's "mandatory" theory.  Plaintiff explains this theory as follows: "The Damage Waiver is an optional product, but Home Depot automatically includes it [in] every contract, without asking whether the customer wants to purchase it, and without disclosing that it is optional, thereby deceiving customers into believing it is a mandatory charge" in violation of the CFA. (Pl.'s Brief in Opp'n to Def.'s Mot. for Summ. J. at 1.)

To prove a claim under the CFA, a plaintiff must establish (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) the occurrence of the deception in a course of conduct involving trade or commerce; and (4) actual damage to the plaintiff (5) proximately

caused by the deception.  <u>Avery v. State Farm Mut. Auto Ins. Co.</u>, 835 N.E.2d 801, 850 (Ill. 2005).  Plaintiffs can recover for unfair as well as deceptive conduct.  <u>Robinson v. Toyota Motor Credit Corp.</u>, 775 N.E.2d 951, 960 (Ill. 2002).  In determining whether a given course of conduct is unfair, the factors to be considered are (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers.  <u>Id.</u> at 961.  All three factors do not need to be satisfied to support a finding of unfairness; rather, a practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.  <u>Id.</u>

Home Depot contends that its conduct was neither deceptive nor unfair and divides its arguments in support of its motion into three categories.  In Home Depot's view, plaintiff has not offered evidence that he was deceived in connection with (1) rentals prior to September 2004 (because plaintiff testified that he does not recall those rentals in detail); (2) rentals where plaintiff testified he did not read the rental agreement (which is all of his rentals); and (3) rentals where plaintiff declined the damage waiver or any rentals thereafter.[3]

---

[3]  Plaintiff concedes that the "mandatory" theory "does not apply to any transactions subsequent to the December 28, 2004 rental." (Pl.'s Brief in Opp'n to Def.'s Mot. for Summ. J. at 11.)

We do not find it necessary to engage in a lengthy discussion of each "category" of rentals because plaintiff has failed to prove a critical aspect of the "mandatory" theory: that Home Depot "failed to disclose" the optional nature of the damage waiver. Plaintiff's theory is that Home Depot deceived customers into believing that the damage waiver was a mandatory charge by failing to inquire whether the customer wished to purchase it <u>and</u> by failing to disclose that the waiver is optional. Even taking as true plaintiff's testimony that salespeople never orally informed him that the waiver was optional, the evidence demonstrates that Home Depot did in fact disclose that the waiver was optional in the plain language of the Rental Agreement. The Terms Page of the Rental Agreement stated: "Damage Waiver. *If I pay the damage waiver charge* for any Equipment, this agreement shall be modified to relieve me of liability for accidental damage to it . . . ." (Def.'s Reply, Ex. A to Ex. 3 (emphasis added).) The above-emphasized language indicates that the damage waiver charge is optional. Moreover, the Front Page of the Rental Agreement in most instances of plaintiff's rentals stated: "I ACCEPT THE BENEFITS OF THE DAMAGE WAIVER (IF APPLICABLE) DESCRIBED IN PARAGRAPH 11 IN THE TERMS AND CONDITIONS OF THIS RENTAL AGREEMENT." (<u>Id.</u>) This language also signaled to the customer that the damage waiver was optional and something that the customer had the choice of "accepting" or not. The damage waiver charge was listed separately

from the rental charge on the Front Page, and unlike the situation in the case cited by plaintiff, the damage waiver was not labeled deceptively; it was listed correctly as a "Damage Waiver."

Plaintiff admits that he received Rental Agreements for his tool rentals and that he signed those agreements. When asked if he read the Rental Agreements before signing them, plaintiff testified that he did not read them other than noting the rental charges and his name:

> Q. Let's break down all that testimony. First of all, I believe that this is the--this September 2004 transaction is the first one that you have a specific recollection of the events surrounding your signing and executing the rental agreement, correct?
> A. It's a little closer to today.
> Q. So this is the first one that you can remember what happened, correct?
> A. Correct, plus it was a pretty big tool.
> . . .
> Q. Do you recall if you read the agreement?
> A. I didn't read it. They present it to you, and you sign it, get your tool and go.
> Q. I want to be very clear on that point, did you read--
> A. Verbatim?
> Q. --the rental agreement that we have marked as Exhibit 13 prior to signing the bottom of it?
> MR. ORLOFSKY: Are we talking about the first page of this exhibit?
> MR. HASKINS: Yes.
> A. Right. Well, I read, the total and I'm sure I read, you know, where to sign, but as far as reading the little special terms and this, I probably just signed it. I'm sure I just signed it.
> BY MR. HASKINS:
> Q. So it's your testimony that you didn't read the agreement?
> A. No. I had been to Home Depot before, signed for tools, so I signed it.
> . . .

Q.  . . . In connection with your rental on September 13, 2004 of an electric breaker from Home Depot, did you sign a written agreement that was similar to Exhibit 13?
A.  I don't recall signing one.
Q.  Is it your testimony that you did not sign one?
A.  I just don't recall signing one.
. . .
Q.  Do you recall if you read the rental agreement before signing it?
A.  I'm sure I didn't.
Q.  You're sure that you did not?
A.  Sure.  I mean, I've been there 20 times, so I'm sure I didn't read it.
Q.  You're sure that you didn't read it?
A.  Right.
Q.  Do you recall if you read any of the rental agreements that you had signed that we have looked at up until September 13 of 2004?
A.  Word for word, I'm sure I didn't.  It's just presented to you, sign here, you take it.
. . .
Q.  Is that your signature at the bottom of page 1 of Exhibit 15?
A.  Yes.
. . .
Q.  Did you read this contract before you signed it?
A.  You know, again word for word the boilerplate at the bottom, no.  The $15.24 total, yes.
Q.  Is there any other part of the contract that you read?
A.  No, just my name.  It's correct, of course.

(Tr. of Pl.'s Dep. at 110-112, 120-121, 134.)

The undisputed evidence is that plaintiff chose not to read the Rental Agreement.  The gist of his testimony is that he did not read the agreement closely or thoroughly because he wanted to take his rented tool and get out of the store as quickly as possible. Had he read the Rental Agreement, he would have discovered that the damage waiver was optional.  His failure to read the agreement dooms his CFA claim.  "One is under a duty to learn, or know, the

-13-

contents of a written contract before he signs it, and is under a
duty to determine the obligations which he undertakes by the
execution of a written agreement." Leon v. Max E. Miller & Son,
Inc., 320 N.E.2d 256, 260 (Ill. App. Ct. 1974); see also In re
Marriage of Kloster, 469 N.E.2d 381, 383 (Ill. App. Ct. 1984) ("One
who has had an opportunity to read a contract before signing, but
signs before reading, cannot later plead lack of understanding or
that the contract misled him."); Heller Fin., Inc. v. Midwhey
Powder Co., 883 F.2d 1286, 1292 (7th Cir. 1989) ("[B]asic contract
law establishes a duty to read the contract . . . ."; Randle v.
Glendale Nissan, Inc., No. 04 C 4129, 2005 WL 281229, at *5 (N.D.
Ill. Feb. 2, 2005) (dismissing CFA claim where plaintiff "pled
herself out of court" by alleging that she signed an automobile
purchase contract "without reading it carefully").[4]  That a person
is in a hurry is "of no moment." Heller, 883 F.2d at 1292.

It is clear from the evidence that Home Depot did not engage
in any deceptive conduct; the optional nature of the damage waiver
was disclosed in the Rental Agreement.  The disclosures were
minimal, and entirely lacking in emphasis, but were nonetheless
sufficient to inform a customer who read the contract that the

---

[4]  In Heller, the Seventh Circuit noted that some courts have refused to
enforce this duty with respect to form contracts or adhesion contracts in certain
situations, such as where one of the parties to the contract asked the other
party not to read the contract or otherwise prevented the party from reading the
contract, or where enforcing the duty would cause "great hardship."  883 F.2d at
1292.  There is no evidence here that Home Depot asked plaintiff not to read the
Rental Agreement or prevented him from doing so or that enforcing plaintiff's
duty to read the contract causes great hardship.

waiver payment was optional. Plaintiff simply chose not to read the agreement and discover that fact for himself. Therefore, he has failed to demonstrate that any genuine issue exists that Home Depot engaged in a deceptive act.

Nor has plaintiff demonstrated that a genuine issue exists as to whether Home Depot engaged in "unfair" conduct. As set forth supra, the three factors to consider when determining whether conduct is unfair are whether the practice offends public policy; whether it is immoral, unethical, oppressive, or unscrupulous; and whether it causes substantial injury to consumers. Robinson, 775 N.E.2d at 961. Plaintiff contends that it was unfair for Home Depot to employ a "negative option" sales practice by giving customers a Rental Agreement that reflected a charge for the damage waiver and putting the burden on customers to request its removal.

A practice that has not previously been held to be unlawful can offend public policy if it violates a standard of conduct set out by an existing statute or common law doctrine that typically governs such situations. Western Ry. Devices Corp. v. Lusida Rubber Prods., Inc., No. 06 C 52, 2006 WL 1697119, at *4 (N.D. Ill. June 13, 2006) (Grady, J.). Plaintiff points out that a federal statute bars "negative option billing" with respect to cable television service and equipment and cites a handful of various state laws (but no Illinois laws) prohibiting negative options in contexts such as telecommunications services and health insurance.

Plaintiff also quotes a statement by the Colorado Attorney General condemning negative options in connection with "audit insurance" charges by a tax preparer. Plaintiff has failed, however, to point to any statute or common-law doctrine that applies to the instant factual situation, where plaintiff was physically present in the store and was given a written contract to read and consider before signing it.

Plaintiff has also failed to create a genuine issue of material fact as to the other two <u>Robinson</u> factors. "A practice may be considered immoral, unethical, oppressive, or unscrupulous if it imposes a lack of meaningful choice or an unreasonable burden on the consumer." <u>Western Ry.</u>, 2006 WL 1697119, at *5. If plaintiff had read the Rental Agreement, he would have understood that the waiver was optional. As noted <u>supra</u>, one has a duty to read a contract before signing it, so it can hardly be characterized as a "burden" for plaintiff to be expected to have read the contract (especially considering that it consisted of only two pages, only one of which contained the terms and conditions), nor can it be said that plaintiff was deprived of a "meaningful choice." As for the third factor, plaintiff has not even attempted to argue that he suffered "substantial injury" as a result of Home Depot's conduct, and there is no evidence that such injury occurred.

As to the "mandatory" theory, plaintiff has failed to demonstrate a genuine issue of material fact as to whether Home Depot's conduct constituted a deceptive or unfair practice in violation of the CFA.

### 2. The "Worthless" Theory

The parties have filed cross-motions for summary judgment in regard to plaintiff's "worthless" theory, which is encompassed by both Counts I and II. Plaintiff explains the "worthless" theory as follows: "The Damage Waiver provides little or no usable protection and therefore its sale is deceptive and unfair." (Pl.'s Brief in Opp'n to Def.'s Mot. for Summ. J. at 1.) Defendant's position is that the plain language of the Rental Agreement clearly shows that the damage waiver relieves plaintiff of some potential liability and that it therefore had value.

The damage waiver provided:

If I pay the damage waiver charge for any Equipment, this agreement shall be modified to relieve me of liability for accidental damage to it, but not for any losses or damages due to theft, burglary, misuse or abuse, theft by conversion, intentional damage, disappearance or any loss due to my failure to care properly for such Equipment in a prudent manner (including without limitation by using proper fuel, oil and lubricants and not exceeding such Equipment's rated capacity, if applicable).

(Def.'s Reply, Ex. A to Ex. 3.)

Plaintiff's analysis of the value of the damage waiver is as follows. The third paragraph of the Terms Page states:

> I agree that, upon execution of this agreement, I assume all risks of loss, theft, damage or destruction, partial or complete, of the Equipment from any and every cause whatsoever.

(Id.) Plaintiff contends that this assumption of risk is "substantially curtailed" by two subsequent portions of the terms and conditions. The first is the following provision of the fifth paragraph:

> I agree to surrender the Equipment to you upon termination hereof, in as good order and condition as when received, except for reasonable wear and tear resulting from proper use, and if returned unclean, I may be charged a reasonable cleaning fee.

(Id.) The second provision is contained in the sixth paragraph:

> I agree immediately to discontinue using Equipment that becomes unsafe or in a state of disrepair, and immediately to notify you of such fact. You have the option to make such Equipment operable within a reasonable time, provide me with a similar piece of Equipment or adjust the rental charge. However, if such Equipment is unsafe or in disrepair because of any improper use or maintenance, I will bear the expense of such replacement or repair or, at your option, be declared in default.

(Id.)

In plaintiff's view, "[s]ince the renter must return a tool in the same condition it was received, *except* for wear and tear resulting from proper use, the 'except' clause means that the renter is not liable for any damage that is the result of wear and tear during proper use." Reasoning that "wear and tear" is defined as "[l]oss, damage, or depreciation resulting from ordinary use and exposure," plaintiff then argues that "[u]nder paragraph 5,

therefore, renters are not responsible for damage that occurs during the ordinary use of a rented tool." (Pl.'s Mem. in Supp. of Mot. for Summ. J. at 3.)  Paragraph 6 provides that renters are liable for replacement or repair due to improper use or maintenance of equipment.  According to plaintiff, read together, paragraphs three, five, and six define a renter's contractual liability as follows: renters are obligated to pay for damage caused by their improper use of the tool, but not damage that occurs during ordinary and proper use.  The damage waiver covers accidental damage, but not damage due to misuse or abuse.  Plaintiff's position is that the damage waiver "excludes from its protection the only exposure a renter has under the contract, which is for damage that occurs due to improper use," and therefore does not provide any value.  (<u>Id.</u> at 5.)

Plaintiff's construction of the Rental Agreement suffers from two major flaws.  First, plaintiff incorrectly equates "reasonable wear and tear resulting from proper use" with "damage that occurs during ordinary use of a rented tool."  The problem with this jump in logic is obvious.  "Wear and tear" does not encompass all damage that occurs during the ordinary use of a tool.  Let us take a carpet cleaning machine, a piece of equipment that plaintiff actually rented, as an example.  The machine has internal parts that will experience incremental wear over time and may eventually break simply from repeated use.  That is "wear and tear" damage in

the commonly understood use of the phrase. There are many other ways in which the carpet cleaner could be damaged during proper use besides "wear and tear," such as damage occurring from the machine accidentally hitting a wall or falling down a stairway. We reject plaintiff's contention that the contract "eliminates all liability for damage during normal use" by virtue of the "wear and tear" clause.

The second critical flaw in plaintiff's argument is his failure to acknowledge that accidental damage to a tool can occur even when a tool is not being used at all, and that therefore the damage waiver covers not only damage occurring during proper use of a tool, but also accidental damage occurring when a tool is not in use (assuming that it is being cared for properly). For example, a customer transporting a tool from a Home Depot store to his home or job site could be involved in a car accident whereby the tool is destroyed. This would be accidental damage that does not occur during "use." Another example would be where the customer stores a tool in his garage and something else in the garage falls on the tool and damages it. This is also accidental damage that does not occur during use. The damage waiver relieves the customer from "accidental damage."

Plaintiff has failed to show any genuine issue of material fact regarding the "worthless" theory. On the other hand, the plain language of the Rental Agreement demonstrates that the damage

waiver does have value.  It modifies the broad allocation of risk in paragraph 3 of the Terms Page by relieving the renter from liability for accidental damage to the tool--both when the tool is being used properly and when the tool is not being used at all.

The predicate of plaintiff's "worthless" theory is that Home Depot's conduct was deceptive or unfair because the damage waiver has no value.  Home Depot has shown that the damage waiver has value; therefore, summary judgment will be entered in defendant's favor and against plaintiff on the "worthless" theory (which plaintiff advances in both Counts I and II of the Second Amended Complaint).  In view of our rulings, we need not address Home Depot's argument that the "voluntary payment doctrine" defeats plaintiff's claims.

**B.**   **Class Certification Motion**

Plaintiff has filed a motion for class certification.  In view of our disposition of the summary judgment motions, the motion for class certification is denied as moot.

### CONCLUSION

Defendant's motion for summary judgment is granted. Plaintiff's motion for summary judgment on Count II is denied. Plaintiff's motion for class certification is denied.

DATE:        July 18, 2007

ENTER:
_____

John F. Grady, United States District Judge